Filed 3/2/15  P. v. Bautista CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE BAUTISTA,<br><br>    Defendant and Appellant. | H039916<br>(Santa Clara County<br>Super. Ct. No. CC945182) |

## I.    INTRODUCTION

Defendant Jose Bautista appeals after a jury convicted him of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c);[1] count 1), attempted second degree robbery (§§ 664, 211, 212.5, subd. (c); count 2), and willful discharge of a firearm with gross negligence (§ 246.3, subd. (a); count 3).  The jury found true allegations that defendant personally used and intentionally discharged a firearm during the commission of the robbery and attempted robbery.  (§ 12022.53, subds. (b) & (c).)  The trial court sentenced defendant to a 22-year prison term, consisting of a two-year term for the robbery charged in count 1 and a 20-year term for the associated firearm discharge enhancement, with a concurrent term for count 2 and a stayed term for count 3.

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant contends: (1) his trial counsel was ineffective for failing to pursue a motion to exclude evidence of gunshot residue; (2) the prosecutor committed misconduct by commenting on defendant's failure to testify and by attacking the integrity of defendant's trial counsel; and (3) the trial court erred by failing to instruct the jury on a lesser-included firearm allegation. We will affirm the judgment.

Appellate counsel has filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

## II. BACKGROUND

### A. The Robbery and Firearm Discharge

At the end of May 2009, Bunlong Hong wanted to buy a used Honda or Acura car. He responded by email to a Craigslist advertisement of an Acura Integra. A person using the email address trannguen@hotmail.com corresponded with him and provided a phone number with an 831 area code. The person said his name was Tran and that he needed to sell the Integra because he had "a baby on the way."

Hong called the phone number. A female voice answered, but when Hong asked for Tran, the female said it was the wrong number. Hong called back later. This time, when he asked for Tran, the female said, "He'll have to give you a call back." Hong later received a call back from the same phone number. A male spoke to him and they made plans to meet so Hong could purchase the Integra.

On May 31, 2009, Hong's coworker, Phong Tang, gave Hong a ride to San Jose. Upon arriving in San Jose, Hong called the phone number. A female answered again, telling Hong he would get a call back. The male called back a few minutes later. They set up a meeting place. Hong then went to the bank and withdrew cash.

Hong and Tang arrived at the designated meeting spot, in front of a house on Yerba Buena Avenue, at about 3:00 p.m. Seeing no one at the location, Hong called the

2

phone number again. The male answered and said he would be there in a few minutes. Shortly thereafter, two individuals approached. Both were dressed inappropriately for the warm weather: they were in hooded sweatshirts, with the hoods pulled up over their heads. One of the individuals—later identified as defendant—wore a plain black sweatshirt. The other individual wore a tan sweatshirt with printing on it.

Defendant and his companion stood about five feet away from Hong and Tang. Defendant told Hong and Tang to get into their car. When Hong and Tang did not do so, defendant repeated his command. Tang then said, "We're not going to get in the car." In response, defendant asked, "You think I'm playing?"

Defendant then pulled a revolver out of the front pocket of his sweatshirt and fired a round into the air. He directed Hong and Tang towards the car. As Hong and Tang started to get into the car, defendant asked Tang for his wallet.

At that point, a neighbor came out of a nearby house and asked, "What's going on?" Defendant told Tang to "[h]urry up" and give him the wallet, which Tang did. Defendant and his companion left soon afterwards, driving away in a car located nearby, which appeared to be a Nissan Maxima.

### B.  *911 Call and Initial Descriptions*

Hong called 911 following the incident, saying he had just been "mugged." He described the Maxima as silver, tan, champagne, or gold colored. He described the two men as being in their early to mid 20's and Hispanic.

In the 911 call, Hong said the shooter had been wearing a black pull-over sweatshirt and a baseball cap. The shooter's baseball cap was red with a red bill; it looked like "a Cincinnati one." The shooter was "heavyset"—between 240 and 250 pounds—and about six feet tall. He had "[l]ight fuzz" on his mustache area. The second person had been wearing a tan colored hoodie. The second person was also "big"—about 230 to 240 pounds.

3

When police responded to the site of the shooting and robbery, Hong provided the phone number that he had called to set up the meeting. The phone number belonged to Elisa Ramirez, who had a dating relationship with defendant.

Hong told a responding officer that the shooter had been a Hispanic male, about 18 to 20 years old, about six feet two inches tall, weighing about 240 pounds. The shooter wore a black hoodie and a red baseball cap with a "C" on it.

According to Hong, the second person was also a Hispanic male, also about 18 to 20 years old, about five feet 11 inches tall, weighing about 220 pounds. The officer's notes indicated that Hong said that the second person had also been wearing a black hoodie.

Tang told a responding officer that the shooter had been wearing a baseball cap, which was black with red on the underside of the bill. Both men had been wearing hooded sweatshirts with the hoods up. The shooter wore latex gloves and a black hooded sweatshirt. The shooter was about six feet to six feet one inch tall and weighed about 240 pounds. The shooter had a light goatee and light brown eyes.

According to Tang, the second person was about five feet 10 inches or five feet 11 inches, weighed about 230 pounds, and wore a gold or yellow colored hooded sweatshirt.

Tang was shown a photo lineup on the same day as the incident. He identified a photo of defendant, saying, "I think that's the guy who had the gun."[2]

## C.    Defendant's Arrest

San Jose Police Officers Gina Tibaldi and Lee Tassio went to defendant's residence within a few hours of the incident. Defendant and two men (his brothers) were

---

[2] The record does not indicate whether Hong was also shown a photo lineup on the day of the incident.

4

outside, drinking beer, when the officers arrived. Defendant was wearing a black hooded pull-over sweatshirt and a red baseball cap with white lettering.

Due to the possibility that defendant had a gun, the officers took cover behind their patrol car doors and ordered the three men to show their hands and go down to the ground. The three men did not comply despite repeated commands. Defendant then threw his hat onto the ground and dove into a minivan, while his brothers "proned out" on the ground. Officer Tassio ordered defendant to come out of the minivan, and about 30 seconds later, defendant did so. Officer Tassio then placed defendant under arrest.

Police collected evidence from defendant's house that night. A computer found on the kitchen table contained photographs of a green or teal Acura. The photographs were the same ones in the Craigslist ad, and they had been last accessed by a user on May 28, 2009. The computer had also been accessed by a person using the email address trannguen@hotmail.com.

Defendant's mother owned a Nissan Maxima that was later located at defendant's residence. The police did not find a revolver or any items belonging to Hong or Tang at defendant's residence.

### D.    *Gunshot Residue*

At about 9:15 p.m. on the night of defendant's arrest, Officer Tassio performed a gunshot residue test on defendant's hands in an interview room at the police station. Officer Tassio wore latex gloves during the procedure, but he had not been wearing gloves when he handcuffed defendant.

Criminalist Melissa Hengoed analyzed the gunshot residue test kit obtained by Officer Tassio, and she examined defendant's sweatshirt for gunshot residue.

At trial, Hengoed explained that gunshot residue particles contain three elements: lead, barium, and antimony. The presence of individual lead, barium, and antimony particles can also indicate that a gun was fired. Although those individual elements can

5

come from alternative sources other than a firearm, when they are combined with an actual gunshot residue particle it is more likely that they, too, came from a firearm.

If gunshot residue particles are found on someone's hand, it may indicate any of the following: (1) the person was in the proximity of a firearm; (2) the person discharged a firearm; (3) the person handled a firearm; or (4) the person was in contact with a surface that contained gunshot residue—in other words, there was a transfer of the gunshot residue to the person from something or someone else.

When a firearm discharges, gunshot residue spreads, on average, 14 feet downrange and two to three feet on either side. Gunshot residue is easily lost by a person's normal daily activity. Most gunshot residue is lost within two to three hours.

Defendant's sweatshirt contained individual antimony, lead, and barium particles on both sleeves and on the front pouch area. There were also individual antimony, lead, and barium particles on the sample taken from defendant's right hand. There was one gunshot residue particle (i.e., a particle containing all three elements) on the sample taken from defendant's left hand.

Hengoed testified it was possible that gunshot residue transferred to defendant's hands from the arresting officer's hands, since the officer drew his gun before handcuffing defendant and did not wear gloves during the arrest. The crime lab recommends that officers wear gloves during arrests in order to prevent gunshot residue transfers. It was also possible that gunshot residue transferred to defendant's hands from the police car seat, since defendant's hands were handcuffed behind his back as he rode in the police car.

### E.     *November 2010 Photo Lineup*

About six months after the incident, in November of 2010, Hong had been shown a photographic lineup. No. 6 in the lineup was a man named Wingel Zelaya. Hong had picked out No. 6 and said it looked like "one of the guys involved," meaning the

6

accomplice, not the shooter. Tang was also shown the photographic lineup with Zelays's photo in November of 2010, but he had not picked anyone.

### F. Trial Descriptions

At trial, Hong described the shooter as wearing a black hooded sweatshirt, weighing about 230 pounds, and five feet 10 inches to five feet 11 inches tall. He explained that a Cincinnati hat would have a white "C" on it. Because the shooter's hood covered some of the cap, Hong could have been mistaken about the logo. Hong described the man in the tan sweatshirt as about the same weight as the shooter, but shorter: about five feet nine inches tall.

At trial, Tang described the shooter as wearing a black sweatshirt and a black baseball cap with a red bill. The shooter's hood was covering some of the baseball cap, so Tang did not see any logo on the cap. According to Tang, the shooter had been about six feet or six feet one inch tall; the other man had been two to three inches shorter. Both were "heavyset." The gunman had worn latex gloves and had a "light goatee."

Neither Hong nor Tang was able to identify defendant at trial. Hong had not been able to identify defendant at the preliminary hearing.[3] At both the preliminary hearing and at trial, defendant wore glasses. During the incident, neither the shooter nor the other man had been wearing glasses. According to Tang, defendant's weight was different than the person he had identified as the shooter in the photo lineup shown on the day of the incident.

### G. Defense Case

The defense theory was that defendant was not the shooter, although he may have been the accomplice. The defense presented evidence suggesting that Zelaya was the shooter.

---

[3] Tang was also unable to identify defendant at the preliminary hearing, but that fact was not adduced at trial.

Sandra De La Cruz was pregnant with Zelaya's baby in May of 2009. She asked Zelaya to help her out financially at that time. Zelaya was "on the heavy side." In 2009, he owned and wore a red baseball cap. Defendant and Zelaya had become friends through De La Cruz.

De La Cruz considered defendant a "real close friend," like a little brother. She was also close with defendant's family, and she had told defendant she would do her best to help him. At the time of trial, De La Cruz had a custody case with Zelaya, who had cheated on her.

Defendant's brother, Michael Bautista, had been present at the time of defendant's arrest. The three brothers had been listening to music coming from the minivan. They thought the police were coming because the music was loud. Defendant had reached into the minivan to turn down the music, but he had not gone inside the minivan.

### H.    Charges, Verdicts, and Sentence

Defendant was charged with second degree robbery of Tang (§§ 211, 212.5, subd. (c); count 1), attempted second degree robbery of Hong (§§ 664, 211, 212.5, subd. (c); count 2), and willful discharge of a firearm with gross negligence (§ 246.3, subd. (a); count 3), with allegations that defendant personally used and intentionally discharged a firearm in the commission of counts 1 and 2 (§ 12022.53, subds. (b) & (c)).

A jury found defendant guilty of all three counts and found true the firearm discharge allegations.

At the sentencing hearing, the trial court imposed a prison term of 22 years. For the robbery charged in count 1, the trial court imposed a two-year term with a consecutive 20-year term for the section 12022.53, subdivision (c) allegation.[4]

---

[4] The trial court did not impose an additional enhancement for the section 12022.53, subdivision (b) allegation. (See § 12022.53, subd. (f) ["Only one additional term of imprisonment under this section shall be imposed per person for each crime. If (continued)

8

The trial court imposed a concurrent term for count 2 and the associated section 12022.53, subdivision (c) allegation. The trial court stayed the term for count 3 pursuant to section 654.

## III. DISCUSSION

### A. *Ineffective Assistance of Counsel*

Defendant contends his trial counsel was ineffective for failing to pursue a motion to exclude the gunshot residue evidence. According to defendant, there could be no tactical reason for trial counsel not to pursue the motion, and the motion would have been successful. He contends the evidence would have been excluded pursuant to Evidence Code section 801, subdivision (b) or Evidence Code section 352, or because it lacked foundation.

#### 1. Proceedings Below

During the July 5, 2011 hearing on motions in limine, defendant's trial counsel indicated he would be moving to exclude gunshot residue evidence. He presented an oral motion to exclude that evidence, noting that according to the lab report, only one particle of gunshot residue had been found on defendant. Defendant's trial counsel argued that because there were alternative explanations for how one particle of gunshot residue could have been found on defendant, the evidence was "not probative of anything."

In response, the prosecutor argued that the gunshot residue evidence was relevant because its presence on defendant's hand made it more likely defendant had been within close range of a gun, even though there were also "other possible explanations."

---

more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment."].)

The trial court asked defendant's trial counsel to brief the issue in writing, indicating it would rule based on the written brief, the prosecution's response, and the lab report.

Two days later, on July 7, 2011, defendant's trial counsel withdrew the motion, indicating he believed "what the expert from the crime lab will say is . . . a subject of proper foundation" and therefore admissible.

### 2. Standards for Ineffective Assistance of Counsel Claims

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*); see *Strickland v. Washington* (1984) 466 U.S. 668, 690, 694.)

### 3. Evidence Code Section 801

Defendant first contends the gunshot residue evidence would have been excluded pursuant to Evidence Code section 801, which provides: "If a witness is testifying as an expert, his [or her] testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the

10

opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his [or her] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him [or her] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates, unless an expert is precluded by law from using such matter as a basis for his [or her] opinion."

According to defendant, the basis of the gunshot residue evidence—the collection method—was so unreliable as to make the evidence inadmissible pursuant to Evidence Code section 801. (See *People v. Boyette* (2002) 29 Cal.4th 381, 449 [" 'any material that forms the basis of an expert's opinion testimony must be reliable' "].) He points out that the gunshot residue sample was collected about six hours after the incident, after defendant had been handcuffed and placed in the back of a police car by an officer who had recently handled a firearm.

Defendant has filed a request for judicial notice. He asks that we consider three documents not presented to the trial court: a California Department of Justice (DOJ) Physical Evidence Bulletin from 2011; a Federal Bureau of Investigations (FBI) Law Enforcement Bulletin from 2011; and a journal article entitled "Summary of the FBI Laboratory's Gunshot Residue Symposium, May 31—June 3, 2005." We take judicial notice of these documents, but they do not establish that the gunshot residue collection in this case was so unreliable as to require exclusion of the evidence.

Defendant contends that neither the DOJ nor the FBI would have accepted the six-hour gunshot residue sample. Under the DOJ's sampling and submission criteria, "[t]he time interval between shooting and sampling should not exceed 4 hours." "For its acceptance policy, the FBI Laboratory uses a cutoff of 5 hours." However, both FBI documents indicate that these time cutoffs are not uniform. According to the FBI Law Enforcement Bulletin, different laboratories have different criteria, and some laboratories

11

will accept gunshot residue collected beyond five hours after a shooting. According to the Summary of the FBI Laboratory's Gunshot Residue Symposium, "Many participants [at the symposium] stated that an acceptable cutoff time is 4 to 6 hours after the shooting event, whereas some felt that up to 8 hours was appropriate. Still others were comfortable accepting lifts taken more than 12 hours after the shooting."

Defendant also contends the gunshot residue collection here caused unreliable results because the collection did not occur until after defendant was handcuffed and transported to the police station, by an officer who had recently touched his firearm. The DOJ's sampling and submission criteria specifies that "[s]amples should be taken immediately after contact with the subject in the field," and that "[t]o minimize the risk of contamination and/or loss of potential GSR [gunshot residue], sample before handcuffing, transporting, or fingerprinting." The FBI Law Enforcement Bulletin similarly states that "preferably," gunshot residue samples should be collected "before transportation to the police station." According to the Summary of the FBI Laboratory's Gunshot Residue Symposium, symposium participants agreed that sampling should be done at the scene if possible, or "bagged in order to prevent possible contamination," and that "it is possible for a handcuffed person's hands to be contaminated by the prior presence of GSR in the backseat of a police vehicle."

A trial court has broad discretion in determining the admissibility of expert testimony. (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196.) Here, although the circumstances of the gunshot residue collection were not ideal, the gunshot residue evidence collected in this case was not so unreliable as to require exclusion under Evidence Code section 801. Significantly, one particle of gunshot residue and individual particles of the component elements were found on both of defendant's hands, on the front of defendant's sweatshirt, and on both sleeves of his sweatshirt. The presence of particles in multiple places on defendant's person and clothing tended to negate any inference that the particles were present solely due to transfer. Moreover, the expert

12

herself acknowledged that she could not conclude that the particles were present because defendant had discharged a firearm, and she acknowledged that transfer was one possible explanation; she did not opine that defendant had in fact discharged a firearm. Had defendant sought to exclude the gunshot residue evidence as unreliable, the trial court could have reasonably determined that the question of reliability went to the weight to be accorded the gunshot residue evidence, not the admissibility of the expert's opinion.

### 4. Evidence Code Section 352

Defendant next contends the gunshot residue evidence would have been excluded pursuant to Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

According to defendant, the gunshot residue evidence had no probative value because of the "flaws" in the collection procedures, and it presented "an extremely high danger of unfair prejudice." As explained in the above section, the gunshot residue in this case was not collected under ideal circumstances, but the evidence was not so inherently unreliable as to lack any probative value. Moreover, the gunshot residence evidence did not "tend[] to create an emotional bias against" defendant that posed a potential to "inflame the jury." (*People v. Lucas* (2014) 60 Cal.4th 153, 268.) Defendant's criticisms regarding the gunshot residue collection process in this case "attach to the weight of the evidence," and thus did not require its exclusion pursuant to Evidence Code section 352. (See *id.* at p. 231.)

### 5. Lack of Foundation

Finally, defendant contends the trial court would have been required to exclude the gunshot residue evidence because there was no foundation—specifically, that no evidence established that there had been no contamination or transfer.

13

Relying on chain of custody principles, defendant contends the trial court could not have found " ' "that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration." ' " (*People v. Catlin* (2001) 26 Cal.4th 81, 134 (*Catlin*).)

" ' "The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." [Citations.]' [Citations.]" (*Catlin, supra,* 26 Cal.4th at p. 134.) This determination is left to the discretion of the trial court. (*Ibid*.)

Here, the gunshot residue collection process was not performed under ideal circumstances, but nothing about the process was analogous to a missing "vital link" in a chain of possession. (See *Catlin, supra,* 26 Cal.4th at p. 134.) It was not merely speculative to conclude that defendant had a gunshot residue particle and individual element particles on his hands and sweatshirt because he had, in fact, discharged a firearm. Thus, the trial court could reasonably have determined that the evidence was admissible and let any doubt about its reliability " ' "go to its weight." ' " (*Ibid*.)

### 6. Counsel Was Not Ineffective

Defendant has failed to establish that a motion to exclude the gunshot residue evidence would have been meritorious. On this record, defendant's trial counsel made a reasonable decision not to pursue such a motion. Thus, defendant has not established that his trial counsel's performance was deficient, and we conclude that defendant's trial counsel was not ineffective. (See *Lopez, supra,* 42 Cal.4th at p. 966.)

14

### B. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct and *Griffin* error (*Griffin v. California* (1965) 380 U.S. 609 (*Griffin*)) by commenting on defendant's failure to testify and by attacking the integrity of defendant's counsel.

#### 1. Proceedings Below

During opening argument to the jury, the prosecutor summarized the evidence supporting the charges and firearm discharge allegations, emphasizing the following facts: (1) defendant's girlfriend's phone had been used to communicate with Hong, (2) the car used by the perpetrators matched the description of defendant's mother's car, (3) the emails regarding the Integra had been sent from a computer in defendant's house, (4) defendant was found wearing a black pull-over hooded sweatshirt and a red baseball cap, and (5) defendant attempted to hide or flee when the police arrived.

In his argument to the jury, defendant's trial counsel focused on the similar features of defendant and Zelaya, the fact that Zelaya had a baby on the way, the fact the police did not find a gun or any of the victims' property at defendant's house, and the fact that one police report said that both perpetrators had been wearing black hoodies.

In closing argument, the prosecutor addressed the defense argument that Zelaya, rather than defendant, had been the shooter. The prosecutor discussed De La Cruz's testimony and the fact that she had only recently "come[] forward with these statements." The prosecutor then argued: "Ladies and gentlemen, there was no defense to this case. They had to come up with this. . . ." The prosecutor argued that defendant had "just panic[ked]" because of how "bad" it looked for him to have tried to flee when the police arrived. The prosecutor stated, "And just like [defendant] panicked on that day, the defense panicked by calling [De La Cruz] and having this statement for the first time."

Defendant's trial counsel objected: "That's improper argument." The trial court sustained the objection and ordered the jury to "disregard it."

15

### 2.     Alleged *Griffin* Error

Defendant first contends the prosecutor committed *Griffin* error when he told the jury that "there was no defense to this case."  According to defendant, a jury would have interpreted that remark as referring to defendant's failure to testify, since he was the only one who could have denied being the shooter.

*Griffin* established that the Fifth Amendment of the United States Constitution forbids "comment by the prosecution on the accused's silence."  (*Griffin, supra,* 380 U.S. at p. 615.)  "Pursuant to *Griffin,* it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf.  [Citations.]"  (*People v. Hughes* (2002) 27 Cal.4th 287, 371-372 (*Hughes*).)  The California Supreme Court has also suggested "that it is error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide.  [Citation.]  But although ' "*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand," ' the prohibition ' "does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses." ' [Citation.]"  (*Id*. at p. 372.)

The prosecutor's challenged comment did not amount to *Griffin* error.  Taken in context, the prosecutor's argument was simply a " ' "comment[] on the state of the evidence" ' " (*Hughes, supra,* 27 Cal.4th at p. 372)—that is, an argument that the evidence of defendant's guilt was overwhelming, and that De La Cruz's testimony was not believable because she only came forward on the eve of trial.

Even assuming that the prosecutor's comment was improper, we would find the error harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)  First, " 'indirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error.  [Citations.]' [Citation.]"  (*People v. Bradford* (1997) 15

16

Cal.4th 1229, 1340.) Second, the jury was instructed that "[a] defendant has an absolute constitutional right not to testify" and that the jury should not consider defendant's failure to testify or "let it influence your decision in any way." (See CALCRIM No. 355.) The jury was also instructed that "[n]othing that the attorneys say is evidence." (See CALCRIM No. 222.) We presume the jury followed these instructions. (See *People v. Bennett* (2009) 45 Cal.4th 577, 596.) Third, the evidence of defendant's guilt was very strong. Defendant not only matched the physical descriptions given by the victims, but Tang identified defendant as the shooter when shown a photographic lineup containing defendant's photograph on the day of the incident. Defendant's girlfriend's phone had been used to communicate with Hong, his computer had been used to post the Craigslist ad and communicate by email with Hong, and his mother's car matched the description of the getaway vehicle. Defendant attempted to flee or hide when police confronted him, and he had a gunshot residue particle and individual element particles on his hands and sweatshirt. Under the circumstances, any *Griffin* error was harmless beyond a reasonable doubt.

### 3. Denigrating the Integrity of Defendant's Trial Counsel

Defendant next contends the prosecutor committed misconduct by denigrating the integrity of defendant's trial counsel. He points to the prosecutor's assertion that the defense had "come up with" the testimony of De La Cruz and the prosecutor's assertion that "the defense panicked by calling [De La Cruz] and having this statement for the first time."

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or

17

reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).)

"Regarding the scope of permissible prosecutorial argument, . . . ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Hill, supra,* 17 Cal.4th at p. 819.) However, it is "improper for the prosecutor to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 183 (*Sandoval*).)

In *People v. Cunningham* (2001) 25 Cal.4th 926, 1002, the court determined that similar remarks by the prosecutor were "not so extreme that an admonition would not have cured any harm. [Citation.]" In that case, the prosecutor had argued that the defense attorneys' job was "to create straw men. Their job is to put up smoke, red herrings. And they have done a heck of a good job. And my job is to straighten that out and show you where the truth lies." (*Ibid*.)

Here, after defendant's trial counsel objected, the jury *was* admonished to disregard the prosecutor's argument. "We presume that the jury heeded the admonition and any error was cured. [Citation.]" (*People v. Wash* (1993) 6 Cal.4th 215, 263.) Moreover, the challenged remarks were a relatively minor part of the prosecutor's argument, and "[t]hey were clearly recognizable as an advocate's hyperbole. [Citation.]" (*Sandoval, supra,* 4 Cal.4th at p. 184.) "Accordingly, we find no reasonable probability that the jury would have reached a more favorable result absent the objectionable comments. [Citation.]" (*Ibid.*; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### C.     *Failure to Instruct on Lesser-Included Firearm Enhancement*

Defendant contends the trial court erred by failing to instruct the jury on a lesser-included firearm allegation. He suggests that in this case, where the allegation was personal discharge of a firearm (§ 12022.53, subds. (b) & (c)), it would have been

18

appropriate to provide the jury with the option of finding that a principal was armed with a firearm (§ 12022, subd. (a)(1)).

As defendant acknowledges, in *People v. Majors* (1998) 18 Cal.4th 385, 410 (*Majors*), the California Supreme Court expressly held that a trial court has no duty to instruct sua sponte on "so-called 'lesser included enhancements.' " The court explained: "One of the primary reasons for requiring instructions on lesser included offenses is ' "to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between [guilt] and innocence" '—that is, to eliminate ' "the risk that the jury will convict . . . simply to avoid setting the defendant free." ' [Citation.] This risk is wholly absent with respect to enhancements, which a jury does not even consider unless it has already convicted defendant of the underlying substantive offenses." (*Id.* at p. 410.)

Defendant further acknowledges that this court is bound by the holding in *Majors*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).) Nevertheless, in order to preserve the issue for further review, defendant contends that the holding in *Majors* has been undercut by subsequent authority, including *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), and *People v. Seel* (2004) 34 Cal.4th 535 (*Seel*).

In *Apprendi,* the United States Supreme Court held that under the due process clause of the Fourteenth Amendment to the United States Constitution, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra,* 530 U.S. at p. 490.) The court described a sentence enhancement as "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." (*Id.* at p. 494, fn. 19.) Under *Apprendi,* a criminal defendant's right to a jury trial extends to sentencing enhancements such as weapons enhancements. However, *Apprendi* did not address the question of whether a trial court

19

must instruct on lesser-included enhancements.  *Blakely* likewise involved a sentencing issue, not lesser-included enhancements.  (See *Blakely, supra,* 542 U.S. at p. 305.)

In *Seel*, the California Supreme Court acknowledged that *Apprendi* termed the distinction between a substantive offense and a sentencing enhancement " 'constitutionally novel and elusive.' "  (*Seel, supra,* 34 Cal.4th at p. 546.)  The *Seel* court held that in light of *Apprendi,* a premeditation allegation under section 664, subdivision (a) constitutes an element of the offense of attempted premeditated murder only for double jeopardy purposes.  (*Id*. at p. 550.)  However, *Seel* did not overrule *Majors* nor equate conduct enhancements with offense elements for any purpose other than double jeopardy.

We are still bound by *Majors*.  (*Auto Equity, supra,* 57 Cal.2d at p. 455.)  We therefore conclude the trial court did not err by failing to instruct the jury on a lesser included firearm allegation.

## IV.   DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MIHARA, J.

_____
MÁRQUEZ, J.